**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | |
| | : | **Case No. 22-cr-25 (APM)** |
| STEFANIE CHIGUER, | : | |
| | : | <u>**UNDER SEAL**</u> |
| Defendant. | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.  For the reasons set forth herein, the government requests that this Court sentence defendant Stefanie Chiguer to 60 days of home detention as a condition of 36 months of probation, 120 hours of community service, and $500 in restitution.

**I.      Introduction**

The defendant, Stefanie Chiguer, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars' in losses.[1]

On April 7, 2022, Chiguer pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building.  As explained herein, a sentence of 60 days' home detention is appropriate in this case because Chiguer: (1)

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20.  That amount reflects, in part, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

filmed rioters attacking Metropolitan Police Department ("MPD") officers on the West Plaza of Capitol grounds and yet proceeded to breach the Capitol building; (2) entered the Capitol through the Senate Wing Doors while a loud alarm was blaring and other rioters were entering the building through smashed-out windows adjacent to those doors; (3) entered the Rayburn Conference Room, where she posed for celebratory photographs; and (4) participated in three separate breaches of police lines inside the Capitol—in the Crypt, near the Memorial Doors, and just outside the House Chamber—and continued parading through the Capitol despite witnessing officers in distress.

The Court must also consider that Chiguer's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for her actions alongside so many others, the riot likely would have failed to delay the certification vote.

Nevertheless, the Court should also consider ███████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████.

Considering all of the relevant factors, the government's recommended sentence is warranted.

## II.     Factual Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the stipulated Statement of Offense ("SOO") filed in this case, ECF No. 37, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters in an effort to disrupt the peaceful transfer of power after the 2020 presidential election.

### *Chiguer's Role in the January 6, 2021 Attack on the Capitol*

On January 5, 2021, Chiguer traveled from the Dracut, Massachusetts area with her companions Kirstyn Niemela and Mark Leach[2] to attend the "Stop the Steal" rally in support of former President Trump.  Chiguer and Niemela had attended an earlier event in December of 2020, also in Washington, D.C., to protest the 2020 presidential election results.  Between January 5 and 7, 2021, Chiguer, Niemela, and Leach stayed at a hotel in Washington, D.C.  At the hotel, the three of them met Kansas residents Michael Eckerman and his cousin, as well as Person-1, who was from Missouri.[3]  They developed a bond over their support for the former president, and the group of six traveled together the next morning to attend the "Stop the Steal" rally on the Ellipse.

Chiguer, Niemela, and Leach wore matching black sweatshirts with "We the People Are Pissed Off" emblazoned on them and draped American flags around them like capes.  *See* Figure 1.  Eckerman wore a tactical vest, neon yellow gloves, and a red ball cap.

---

[2] On January 26, 2023, after a four-day jury trial, Niemela was convicted of four counts related to her conduct at the Capitol on January 6, 2021.  *See* Jan. 26, 2023 Minute Entry, *United States v. Eckerman, et al.*, 21-cr-623 (CRC).  Judge Cooper is scheduled to sentence Niemela on June 8, 2023.  Leach, who at the time was dating Niemela's mother, accompanied Niemela and Chiguer onto Capitol grounds on January 6, 2021, but did not enter the Capitol building itself and was not charged.  He testified on Niemela's behalf at her trial.

[3] For his conduct on January 6, 2021, Eckerman pleaded guilty to Assaulting Certain Officers, in violation of 18 U.S.C. § 111(a), and was sentenced by Judge Cooper to 20 months' imprisonment,



***Figure 1:*** *(from left to right) Leach, Chiguer (circled in orange),*
*Niemela, and Eckerman on January 6, 2021*

After listening to the former president's speech, the group marched to the Capitol.  At

approximately 2:01 p.m., Chiguer, Eckerman, and Person-1 observed rioters assaulting MPD

officers on the West Plaza of the Capitol grounds, near the scaffolding set up for the upcoming

presidential inauguration.[4]  *See* Ex. 1 (Officer D.H. Body Worn Camera ("BWC") footage, at time

stamp 14:01:00-14:04:20).[5]  Chiguer filmed these assaults on police and Eckerman's reaction to

them.  *See* Ex. 2 (Chiguer video capturing assaults on MPD officers) and Figure 2.  She was

captured on BWC filming the rioters' attacks.  *See* Figure 3.

---

24 months' supervised release, and ordered to pay $2,000 in restitution.  *See United States v.
Eckerman, et al.*, 21-cr-623 (CRC), ECF No. 114.

[4] Evidence presented at Niemela's trial showed that Niemela and Leach separated from the group
before this moment.  Around this time, Niemela climbed a tree and took a selfie photograph within
the restricted area of Capitol grounds, and Leach suffered the effects of gas from a chemical irritant
canister.  *See United States v. Eckerman, et al.*, 21-cr-623 (CRC), Government Trial Exhibit
("GEX") 823.4; Trial Tr. at 753:18-754:25.

[5] All audio/video exhibits cited in this memorandum will be provided to the Court via a file sharing
platform.  BWC time stamps refer to the time stamp in the upper right-hand corner of the video.



*Figure 2:* *Eckerman (red hat) watching rioters assault police, as filmed by Chiguer*



*Figure 3:* *BWC footage capturing Chiguer (circled in orange)*
*filming rioters attacking MPD officers*

Chiguer also witnessed a rioter spray an orange chemical irritant, likely bear spray, directly at MPD Officer A.A.—an incident captured by Chiguer using her cell phone as well as on BWC. *See* Figure 4, Exs. 2 and 3 (Officer A.A. BWC footage at time stamp 14:01:00-14:04:20).  The spray hit Officer A.A. directly in the eyes, temporarily blinding him and requiring him to retreat from the scene.



*Figure 4: Eckerman (tactical vest) next to rioter about to spray chemical irritant canister (circled in yellow) at MPD Officer A.A.*

Eckerman began to inch closer to the fighting, prompting Person-1 to pull him away from the fray. *See* Figure 5 below and Ex. 1 (Officer D.H. BWC). Person-1 notified Chiguer and Eckerman that she was leaving because she was scared. Person-1 then departed. She later wrote to Eckerman in a group chat, "[t]hats when I quit filming and tried to pull you back! I was scared you were gonna get hurt! And you got face sprayed right after that!" *See* Ex. 4 (text message group chat between Chiguer, Eckerman, Niemela, and others). For her part, Chiguer chimed in that it was "[c]razy how I got [the assault on officers] on camera!" *Id.*



***Figure 5***: *Eckerman (red hat, yellow gloves) and Person-1 as she attempts to pull him away from the clash between officers and rioters, from Officer D.H.'s BWC*

Despite witnessing these violent scenes, Chiguer was not deterred and did not leave the Capitol grounds. Instead, she and Eckerman moved deeper into the crowd on the West Plaza. There, Chiguer witnessed rioters moving metal bike rack barricades on multiple occasions, sometimes using them as ladders to scale the Capitol walls. *See* Ex. 5 (video recorded by Chiguer). She saw rioters ripping away the white sheeting designed to block access to the areas under the scaffolding that had been erected for the construction of the Inauguration stage. Ex. 6 (another video recorded by Chiguer).

Chiguer and Eckerman reunited with Niemela near the foot of the scaffolding. They took advantage of the mob's breaches of barricades and police lines to advance on the Capitol building itself. Chiguer, Eckerman, and Niemela—hereinafter, "the trio"—walked under the scaffolding and ascended a set of exterior stairs leading from the West Plaza to the Upper West Terrace of the Capitol. *See* Figure 6 below.



***Figure 6***: *Eckerman (blue box), Niemela (green box), and Chiguer (orange arrow) climbing the northwest stairs to the Upper West Terrace, as captured in video recorded by another rioter*

### *Chiguer's Entry into the Capitol Building*

At approximately 2:24 p.m., as captured on the Capitol building's CCTV surveillance video, the trio walked past broken windows that other rioters were climbing through and entered the Capitol building through the Senate Wing Doors, which also featured a broken glass window.[6] *See* Figure 7.  The trio ignored the blaring security alarms.

---

[6] Rioters first breached the Capitol building only eleven minutes earlier, at approximately 2:13 p.m., in this same spot.  Rioters smashed the windows on either side of the Senate Wing Doors, climbed through, and proceeded to open the doors to allow more rioters to stream in.



***Figure 7***: *CCTV footage capturing Eckerman and Chiguer (in red hat and top bun, respectively, in yellow circle) walking past broken window as a rioter climbs through, just before they entered the Capitol building through the Senate Wing Doors*

### Interior Breach #1: Chiguer, Niemela, and Eckerman Participate in the Breach in the Crypt

After entering the Capitol building, the trio turned right and entered the Crypt. There they found a large crowd of rioters temporarily stymied by a group of approximately ten U.S. Capitol Police ("USCP") officers who had formed a line across the center of the Crypt, using their bodies to block the mob from further accessing the Capitol. Ex. 7 (rioter footage of Crypt breach) at 00:00-00:45. For a brief time, the situation was a stalemate, though the officers were massively outnumbered. *Id.* After a few minutes, however, the mob of rioters—with the trio towards the back—surged forward, overwhelming the officers with the force of their collective bodies and breaching the police line. *Id.* at 1:35-2:30. Dozens, if not hundreds, of rioters were ahead of the trio in this space; yet the trio still made their way through the crowd to within a few feet of USCP Lt. Brooke Detorie, who testified at Niemela's trial, and her trapped colleagues. *See id.* at 3:09-3:18; *see also* Figures 8-9.



*Figure 8* (left): *Rioter footage capturing the outnumbered police officers, including Lt. Detorie (blonde, center between flags), attempting to block the mob from advancing through the Crypt* *Figure 9* (right): *Chiguer and Eckerman (circled in yellow) within a few feet of Lt. Detorie (also circled), as they and the mob push past police*

### *Interior Breach #2: Eckerman—with Chiguer and Niemela Close Behind—Pushes Officer Near Memorial Doors, Leading to Breach and Rioter Dispersal Within the Capitol Building*

The mob, including the trio, thereafter encountered a bottleneck. The Crypt exit funneled them into a small corridor near the Memorial Doors, a set of external doors to the Capitol which at that point were secure. Ex. 8 (CCTV footage of corridor near Memorial Doors). Rioters stood shoulder to shoulder, filling the small room, as a group of approximately four USCP officers physically blocked the threshold. *Id.* Just beyond the officers was a stairway leading to the Speaker's Suite and the House Chamber. Unsatisfied with being at the back of the mob, the trio wormed and maneuvered their way through the crowd until they were at the front line of the stand-off between rioters and police officers. *See id.* at 2:27:55-2:28:20; Figure 10.



***Figure 10****: Eckerman (red circle), Niemela (green box), and Chiguer (blue oval) worm their way through stationary crowd to reach the front of the police line, including Officer K.Y. (white oval)*

At the front of the standoff, Chiguer saw police officers blocking her path and even witnessed a rioter being detained by police for breaching the line.  *See* Ex. 9 (rioter footage of Memorial Door breach), at 00:20-1:08.  Chiguer and her fellow rioters proceeded to breach this police line, with Eckerman pushing Officer K.Y. to the ground.[7]  *Id.* at 1:08-end.  The trio thereafter witnessed the space fill up with smoke, as another rioter discharged a fire extinguisher.  *See* Ex. 10 (rioter footage near Memorial Door stairwell) at 00:14-00:35.  Undeterred, the trio took advantage of this second police line breach and ascended the nearby stairs to access the Capitol's second floor, with Eckerman leading the way followed by Chiguer.  *Id.* at 00:50-end.

---

[7] This incident underlies the § 111(a) charge to which Eckerman pleaded guilty.

***Interior Breach #3: Chiguer Joins the Mob Surge Outside the House Chamber
While Terrified Members of Congress Shelter in Place***

The trio proceeded to the Statuary Hall Connector area of the Capitol, leading to the House

Chamber.  There, they encountered a now-familiar situation: a large crowd of rioters at another

bottleneck in front of at least eight police officers using their bodies to form a police line.  *See* Ex.

11 ("JaydenX" video recorded by rioter John Sullivan) at 00:45-1:52; *see also* Figure 11.



***Figure 11****: Screenshot of rioter footage showing Eckerman and Chiguer (sunglasses) in second
and third row of the mob confronting the line of police officers outside the House Chamber*

This was the most sensitive, high-stakes stand-off yet: the police were blocking the rioters

from reaching the elected officials gathered in the House Chamber to certify the results of the 2020

presidential election.  The trio stood in the second and third row of the mob confronting the officers

for approximately five minutes, as members of the crowd standing right next to them shouted at

the officers and demanded they stand aside to allow the mob to fully occupy the building and

confront the "traitors"—in their view, members of Congress.  *See* Ex. 11.

Meanwhile, inside the House Chamber, many members of Congress and their staff

remained sheltered in place—some terrified, some preparing for hand-to-hand combat with rioters,

all knowing that they were the targets of the mob's anger.  In an effort to protect them, USCP plain

clothes officers inside the House Chamber barricaded its main door with furniture and stood guard

with their guns drawn.  *See* Figure 12.  The situation was obviously tense and scary.



***Figure 12****: USCP officers inside the House Chamber with the door barricaded and guns drawn*

After a few minutes, the mob, including Chiguer, surged forward, overwhelming this third set of police officers, pushing them aside, and giving the rioters control of the hallway outside the House Chamber.  Ex. 11 at 4:00-5:45.  Chiguer watched for several minutes as rioters chanted "Stop the Steal!" and banged on the door to the House Chamber (seen in Figure 12), sometimes with flag poles.  *See id.*; *see also* Ex. 12 (rioter footage of House Chamber breach)at 1:45-end.

### Posing for Celebratory Souvenir Photographs Inside the Rayburn Conference Room

The trio then walked down the hallway and entered the Rayburn Conference Room, where they posed for celebratory photographs in front of a portrait of George Washington.  *See* Ex. 13 at 00:10-00:40; Figures 13-14.  They then exited the Rayburn Conference Room and continued their march through the Capitol.  Chiguer passed a clearly marked exit in which the doors were already open and continued parading for another two minutes before turning back and exiting the Capitol through the East Front House Doors at approximately 2:44 p.m.  *See* Ex. 11 at 11:05-end; Figure 15.



***Figures 13 and 14****: Photographs of the trio inside the Rayburn Conference Room*



***Figure 15***

In total, Chiguer, Niemela, and Eckerman spent nearly 20 minutes inside the Capitol.

Chiguer has admitted that she knew at the time she entered the U.S. Capitol Building that she did

not have permission to do so.  SOO ¶ 16.

***Group Texts and Social Media after January 6th***

After Chiguer and Niemela returned home, they participated in a group text message chat with Eckerman, Person-1, and others who attended the rally with them on January 6. Chiguer and the others shared their views of the event as well as the photographs and videos they took that day, including Chiguer's videos capturing the assaults on MPD officers on the West Plaza. Despite members of the group chat acknowledging the violence against police officers that day, Chiguer commented in the chat:



**Figure 16:** *Screenshot of post by Chiguer in group chat on January 13, 2021*

***Chiguer's Pre-Arrest FBI Interview***

After being told by a friend that the FBI was looking for Niemela, Chiguer self-reported to the FBI and agreed to be interviewed. During the interview, which took place on December 1, 2021, Chiguer relayed that she, her children, and Niemela had traveled to Washington D.C. in December 2020 to a protest related to the 2020 presidential election. She admitted that she traveled again to D.C. with Niemela and Leach to attend the "Stop the Steal" rally on January 5,

2021, and that they met Eckerman and others at their shared hotel.  Chiguer admitted to going inside the Capitol with Eckerman and Niemela and to staying inside for about 30 minutes.

Chiguer noted that when she, Eckerman, and Niemela exited the Capitol, they reunited with Leach, who told her that he had been pepper sprayed while on the grounds.  Chiguer acknowledged that she had taken several videos of the events on her cell phone, which she voluntarily provided to the FBI. ████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████

### III.    The Charges and Plea Agreement

On January 14, 2022, Chiguer was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G).  ECF No. 1.  Four days later, on January 18, 2022, she was arrested.  On January 19, 2022, Chiguer was charged by a four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G).  ECF No. 11.

On April 7, 2022, Chiguer pleaded guilty via plea agreement to Count Four of the Information, charging her with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating or Picketing in a Capitol Building.  ECF No. 36.  Chiguer has agreed to pay $500 in restitution to the Department of the Treasury.  *Id.*

██████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████





## V.    Statutory Penalties

Chiguer now faces sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted in the plea agreement and by the U.S. Probation Office ("Probation") in the Pre-Sentence Investigation Report ("PSR"), Chiguer faces up to six months of imprisonment, PSR ¶ 62, and a fine of up to $5,000, *id.* ¶ 76.  Chiguer must also pay restitution under the terms of her plea agreement.  *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008); ECF No. 36.  As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply.  18 U.S.C. § 3559; U.S.S.G. § 1B1.9; PSR ¶¶ 63, 69, 71, 78, 80.

## VI.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the

nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6).  In this case, as described below, all of the Section 3553(a) factors weigh in favor of a term of probation with home detention.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021).  The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021).  While assessing Chiguer's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors.  Notably, for a misdemeanor defendant like Chiguer, the absence of violent or destructive acts is not a mitigating factor.  Had she engaged in such conduct, she would have faced additional criminal charges.

As discussed above, Chiguer went with her companions to the Capitol and observed rioters fighting with the police—events that she recorded on her cell phone and later shared with others. She entered the Capitol building through the Senate Wing Doors approximately 11 minutes after they were initially breached and participated in three separate breaches of police lines.  During her 20 minutes inside the Capitol building, Chiguer was consistently in proximity to the violence being perpetrated by rioters against police officers and property.

Accordingly, the nature and circumstances of the offense establish that a sentence of probation with home detention and community service is more than appropriate.

### B.  Chiguer's History and Characteristics

As set forth in the PSR, Chiguer has no criminal history. She works as a live-in caregiver, and her two children live with her.  PSR ¶¶ 42, 55.  Her employment history involves mainly serving as a home health aide or as a licensed nursing assistant working in nursing homes.  *Id.* ¶¶ at 56-58.  Chiguer has been compliant with her conditions of pretrial release. *Id.* at ¶ 5.

The government acknowledges Chiguer's personal, family, and health information, as discussed in the PSR.  *Id.* ¶¶ 41-42, 47-50.  This history, ███████████████████████ ███████████████████, informs the government's recommendation in this case.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law.  As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." *See United States v. Gallagher*, 21-cr-41, Tr. 10/13/2021 at 37 (statement of Judge Nichols at sentencing).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected president. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Chiguer's actions at the Capitol on January 6, 2021 demonstrate the need for some measure of specific deterrence in addition to general deterrence. She filmed rioters fighting police outside and later shared it in celebratory fashion in a group chat with others. She failed to heed repeated clear signs that her presence on Capitol grounds was unlawful—specifically, barricades, the use of non-lethal crowd control measures (e.g., chemical irritants), broken windows, and a blaring security alarm. Once inside the building, she saw the mob push past police in three separate spaces and yet continued parading and posing for pictures.

That being said, Chiguer has exhibited—and repeatedly expressed—genuine remorse over the course of the past year and a half, ███████████████████████████████████. She has stated that she pleaded guilty early ████████████████████████████ in order to set a good example for her children. The government credits her statements and believes that there is a relatively low likelihood that Chiguer will reoffend, at least in this manner.

### E.  The Need to Avoid Unwarranted Sentencing Disparities[8]

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.  This Court must sentence Chiguer based on her own conduct and relevant characteristics but should give substantial weight to the context of her unlawful conduct: her participation in the January 6 riot.

Chiguer has pleaded guilty to Count Four of the Information, charging her with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating or Picketing in a Capitol Building.  This offense is a Class B misdemeanor.  18 U.S.C. § 3559.  Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply.  U.S.S.G. § 1B1.9.  The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection."  18 U.S.C. § 3553(a).  Although unwarranted disparities may "result when the court relies on things like

---

[8] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Because cases involving convictions only for Class B misdemeanors (i.e., petty offenses) are not subject to the Sentencing Guidelines, the Section 3553(a) factors take on greater prominence. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the

discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr. at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on

the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court should consider the sentences of the defendants discussed below. Approximately 300 defendants have pleaded guilty to January 6-related violations of 40 U.S.C. § 5104(e)(2)(G) (parading) as their only count of conviction, and courts have imposed a wide range of sentences in those cases. At the high end, in *United States v. Kenneth Rader*, 1:22-cr-57 (RCL), Judge Lamberth sentenced the defendant to 90 days of incarceration. At the low end, some such defendants have been sentenced to probation, or probation plus a fine and/or community service. Within that subset of defendants—i.e., those sentenced solely for guilty pleas to the parading charge—Chiguer is most comparable to defendants who participated in at least one breach and filmed violence and/or entered sensitive spaces. In most of those cases, courts have imposed sentences of incarceration. Indeed, a defendant who enters a sensitive space shows particular disregard for the people who work in the building and whose lives are disrupted by such behavior. *See, e.g.*, *United States v. Jancart and Rau*, 21-cr-148 (JEB) and 21-cr-467 (JEB) (observed

violence and entered a sensitive space, sentenced to 45 days' incarceration); *United States v. Kidd*, 21-cr-429 (CRC) (observed and filmed violence, sentenced to 45 days' incarceration); *United States v. Perretta*, 21-cr-539 (TSC) (observed violence, sentenced to 30 days' incarceration); *United States v. Lolos*, 21-cr-243 (APM) (observed violence, sentenced to 14 days' incarceration); *United States v.* Westover, 21-cr-697 (JEB) (entered Speaker's suite and witnessed travel companions steal shard of Speaker's office sign, sentenced to 45 days' incarceration); *but see United States v. Wilson*, 21-cr-578 (APM) (entered sensitive space, sentenced to probation).

Chiguer's case closely resembles *United States v. Peterson*, 21-cr-309 (ABJ), in which the defendant, like Chiguer, observed violence against police officers outside the Capitol and then entered the building through the Senate Wing Door within 10 minutes of the breach.  *Id.*, Sent. Trans., ECF No. 32 at 6-7.  Judge Berman Jackson ultimately imposed 30 days' incarceration. Another relevant comparator is the *Ericson* case.  Ericson entered the Speaker's Conference Room, where he posed with his feet up on the conference table and took a beer from the refrigerator. *United States v. Ericson,* 21-cr-506 (TNM), ECF No. 37 at 3.  After Ericson pleaded guilty to the same parading charge at issue here, Judge McFadden imposed a sentence of 20 days' imprisonment, describing the defendant's entry into an office as follows: "That's a private area and your violation of that space suggests a certain brazenness and intentionality that requires consideration in your sentence.  You could have caused a very dangerous and fearful scene had the speaker or her staff been present in the office when you and others entered it."  *Ericson,* Tr. 12/10/21 at 21.  Judge McFadden concluded that entering offices put Ericson in a "different category" than people "who were only in areas that would normally be open for tours."  *Id.*  The Rayburn Conference Room, which Chiguer and her friends entered and used as a backdrop for celebratory selfies, is a similarly sensitive space.

Nevertheless, in some similar cases that contained similar mitigating factors, courts have sentenced defendants to periods of home confinement rather than traditional incarceration.  *See, e.g.*, *United States v. Kenneth Reda*, 21-cr-452 (TFH) (cooperation with the FBI led to arrest of another rioter, sentenced to 60 days of home confinement, 36 months of probation, and 60 hours of community service); *United States v. Justin McAuliffe*, 21-cr-608 (RCL) (provided immediate cooperation to the FBI and consistently expressed remorse, sentenced to 60 days of home confinement and 36 months of probation); *United States v. Israel Tutrow*, 21-cr-310 (ABJ) (defendant suffering from similar mitigating factors, sentenced to 60 days of home confinement and 36 months of probation).

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).  The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender."  *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).  "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

In light of the comparator cases in which a term of incarceration was imposed, the government's request of home detention with community service to account for Chiguer's history

and characteristics and other factors discussed above would not produce unwarranted sentencing disparities.

**V.      Conclusion**

For the reasons set forth above, the government recommends that the Court impose a sentence of 60 days of home detention as a condition of 36 months of probation, 120 hours of community service, and $500 in restitution.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:     */s/ Jessica Arco*
JESSICA ARCO
D.C. Bar No. 1035204
Trial Attorney, Detailee
601 D St., NW
Washington, D.C. 20530
Telephone: 202-514-3204
jessica.arco@usdoj.gov

*/s/ Michael M. Gordon*
MICHAEL M. GORDON
Florida Bar No. 1026025
Assistant United States Attorney, Detailee
601 D St., NW
Washington, D.C. 20530
Telephone: (813) 274-6370
michael.gordon3@usdoj.gov